FARMER'S UNION CO-OP COMPANY OF MEAD, NEBRASKA, APPELLEE, V. FLAMME BROTHERS, A NEBRASKA PARTNERSHIP, APPELLANT.

245 N. W. 2d 464

Filed September 22, 1976.  No. 40348.

Thomas B. Thomsen of Sidner, Svoboda, Schilke, Wiseman & Thomsen, for appellant.

Crosby, Guenzel, Davis, Kessner & Kuester, for appellee.

Heard before SPENCER, BOSLAUGH, and CLINTON, JJ., and FAHRNBRUCH and GRANT, District Judges.

GRANT, District Judge.

This is an action for damages for the breach of three contracts for the sale of corn by appellant, Flamme Brothers, a Nebraska partnership, to appellee, Farmer's Union Co-op Company of Mead, Nebraska (hereinafter referred to as "Mead Elevator"). The parties entered into two written contracts - one on May 2, 1973, calling for the sale and delivery by Flamme Brothers to Mead Elevator of 100,000 bushels of No. 2 corn at a price of $1.34 per bushel; and one on May 22, 1973, calling for sale and delivery of 30,000 bushels of No. 2 corn at a price of $1.50 per bushel. Each of these contracts contained the provision that "Seller shall deliver the above described grain within O-N-D days to Buyer's elevator in Mead, Nebraska," and a provision calling for a "2¢ Moist Disc." As agreed by the parties, "O-N-D" means delivery during October, November, and December.

Additionally on October 15, 1973, the parties entered into an oral contract for the sale and delivery of 10,000 bushels of No. 2 corn at a price of $2.15 per bushel.

Flamme Brothers delivered 25,613.76 bushels of corn pursuant to the May 2 contract; no corn under the May 22 contract; and 2,732 bushels pursuant to the oral contract of October 15. Mead Elevator paid for all corn delivered, and sued for damages in the amount of $148,978.48 for the difference between the contract price and the market price of the undelivered corn.

Both parties waived jury trial. The evidence submitted to the trial court was undisputed as to the existence of the contracts, the deliveries made, and the correctness of the payments made by Mead Elevator for corn actually delivered. The trial court after hearing all the evidence found generally in favor of Mead Elevator and determined its damages to be $106,423.09.

Flamme Brothers appeals from the overruling of its timely filed motion for new trial. We affirm.

Flamme Brothers is a Nebraska partnership consisting of Vernon Flamme, Donald Flamme, and Velma L. Flamme (the mother of Vernon and Donald). All transactions which are the subject matter of this litigation were conducted by Donald or Vernon or both such brothers.

In late April 1973, the brothers had discussions with Mead Elevator concerning the sale of 100,000 bushels of No. 2 corn. On April 23, 1973, a form of contract was signed by Mead Elevator and sent to Flamme Brothers. This contract called for the delivery of 100,000 bushels of No. 2 corn at a price of $1.34 per bushel with a "Market discount" on moisture content of the corn. The "Market discount" is a fluctuating figure stated in terms of cents per bushel. This proposed contract was not signed by Flamme Brothers, but on May 2 a meeting was held and, at the request of Vernon and Donald Flamme, the phrase "market discount" was changed to "two cents moist disc," meaning there would be a deduction of two cents from the agreed price of $1.34 for each single percentage point of moisture in excess of 15½ percent moisture.

Other than this change, the original form of contract was accepted by the brothers, and on May 2, 1973, the parties executed a contract providing, in relevant part, that: "Buyer agrees to purchase from Seller approximately *100,000* bushels of *corn* at the agreed price of *$1.34 #2, 2¢ moist disc.* per bushel under the following terms and conditions to wit: Seller shall deliver the above described grain within *O-N-D* days to Buyer's elevator in Mead, Nebraska." The italicized words were those inserted in a printed form of contract.

At this meeting of May 2, 1973, discussions were had concerning the acceptable moisture content of the corn. Donald and Vernon Flamme testified that Mead Elevator agreed to accept any corn with a moisture con-

tent of 28 percent or less. The Mead Elevator manager testified he refused to deviate from his general rule of not accepting corn with a moisture content of more than 25 percent. Where there is such a conflict in evidence, this court will presume the controverted facts were decided by the trial court in favor of the successful party, and such findings will not be disturbed unless clearly erroneous. Stauffer v. Wilson, 182 Neb. 129, 153 N. W. 2d 454.

Subsequently, about May 22, 1973, Flamme Brothers again called the Mead Elevator and requested another contract for the sale and delivery of 30,000 bushels of No. 2 corn. This contract was executed in identical form with the May 2 contract, except for an agreed price of $1.50 per bushel, and also called for delivery of the corn at the elevator "within O-N-D days."

Flamme Brothers began its harvest in September 1973, and made its first delivery to the Mead Elevator on September 18, 1973, and continued intermittent deliveries until October 29, 1973. During this time a total of 25,613.76 bushels of corn was delivered, all of which were credited by the Mead Elevator to the May 2 (100,000 bushels) contract, leaving a balance due on that contract of 74,386.24 bushels. No corn was delivered pursuant to the May 22, 1973, contract for 30,000 bushels.

On or about October 2, 1973, the parties entered into an oral contract for 10,000 bushels of No. 2 dry corn at a price of $2.20 per bushel. This contract was completely fulfilled by deliveries between October 3 and October 13, and was paid for and is not the subject of this litigation. Again on October 15, 1973, a second oral contract was entered into between the parties calling for the sale and delivery of 10,000 bushels of No. 2 dry corn at a price of $2.15 per bushel. A total of 2,732 bushels of corn was delivered under this contract between October 15 and October 18, 1973, and fully paid for by the elevator at this $2.15 price, but no further

corn was delivered, leaving a balance due of 7,268 bushels of corn on that oral contract.

It should be noted that each price quoted in the various oral and written contracts was modified by an agreement executed by Flamme Brothers on October 2, 1973. This agreement authorized the Mead Elevator to deduct 2¢ per bushel for each bushel bought and to retain this sum for the purpose of financing capital improvements at the elevator. The net result meant a 2¢ lower cash price was received by Flamme Brothers than that set out in the contract.

The primary thrust of the defense to the action on these contracts is that Flamme Brothers contends that the Mead Elevator wrongfully restricted the amount of corn that could be delivered by Flamme Brothers. Appellant adduced evidence showing that the partnership harvested over 300,000 bushels of corn in 1973 and contracted in advance for 210,000 bushels to appellee and other elevators. The remainder of the corn harvested was placed in the partnership home storage. Appellant's position is that the term "O-N-D" in each of the written contracts means that the elevator must take delivery of the corn at any time during the months of October, November, and December that such corn is tendered to the elevator by the farmer. Appellee's position, as supported by its evidence, is that the custom of the trade with regard to the operation of co-operative elevators requires that the elevator take corn as delivered by farmers to the elevator and, if the elevator is full, the farmers must store the grain for delivery as soon as the elevator can take it.

Appellant introduced evidence tending to show that appellant did actually deliver corn to appellee and that appellee restricted deliveries sometimes on the basis of the moisture content of the corn and sometimes on the basis that the elevator was full. Appellee introduced testimony which specifically controverted the appellant's evidence. The court, in finding for appellee, de-

cided this factual issue in favor of appellee and this finding has ample support in the testimony and will not be disturbed on appeal. See Stauffer v. Wilson, *supra*.

It is not contended by appellant that actual attempts to make deliveries of corn were refused by the appellee, but that appellant was somehow restricted in its deliveries and that a sufficient tender of delivery under an O-N-D contract is made "when the seller actually produces sufficient corn to fulfill a contract and has the actual ability accompanied by immediate physical possibility of reaching out and laying hold of the corn to be delivered * * * and seller offers delivery thereof." The court, by its judgment, decided that no tender was made and that no corn was refused by appellee after being tendered. We hold that in a contract calling for the delivery of goods by the seller at a specified place, tender ordinarily requires physical delivery of the goods at the destination specified in the contract. The trial court could properly find that Flamme Brothers did not so tender any corn that was not accepted. Absent a proper tender of delivery, the appellant Flamme Brothers is liable for breach of the contracts, and there is sufficient evidence to support the trial court's entry of judgment against appellant.

With regard to the issue of damages, the evidence indicates that on December 11 or 12, 1973, Donald Flamme, one of the partners, called Robert Wiegand, manager of Mead Elevator. The contents of the conversation are in some dispute, but Donald Flamme did testify that at that time he did not specifically inform Mr. Wiegand that Flamme Brothers was not going to deliver the corn due under the contracts. Later, on December 17, 18, and 19, 1973, Flamme Brothers did bring into the Mead Elevator several loads of corn for one of its landlords. These deliveries were not credited against the contracts in question, and there is no dispute between the parties that such deliveries should have

been credited, but Mr. Wiegand testified he assumed that Flamme Brothers was going to start fulfilling its own contracts. On December 19, 1973, the Mead Elevator sent an agreement to Flamme Brothers extending the final date of delivery of the contracted corn to January 31, 1974. This extension agreement was not executed by Flamme Brothers.

We note the contradiction in the testimony as to the date that Mead Elevator became aware that Flamme Brothers was not going to fulfill its contracts, as well as the other conflicts in the evidence as set out above with regard to the questions of tender and wrongful rejection of corn deliveries, and we adhere to the oft-stated rulings of this court as set out in H. D. Fager Oil Co., Inc. v. Vanice, 192 Neb. 789, 224 N. W. 2d 372, when the court quoted with approval from Parsons Constr. Co. v. State, 180 Neb. 839, 146 N. W. 2d 211, to the effect: "The judgment of the trial court in a law action where a jury has been waived has the effect of a verdict of a jury and will not be set aside unless clearly wrong. * * *

"It is not the province of this court in reviewing the record in an action at law to resolve conflicts in or weigh the evidence. * * *

"In determining the sufficiency of the evidence to sustain a judgment in a law action, it must be considered most favorably to the successful party, every controverted fact must be resolved in that party's favor, and he must have the benefit of any inferences reasonably deducible from it."

Determining the controverted facts in favor of appellee, the trial court found that it was not until the conclusion of business on December 31, 1973, that appellee knew Flamme Brothers was not going to fulfill its contracts. On January 2, 1974, appellee began to purchase corn from its regular customers to cover the contracts of Flamme Brothers. As agreed by the parties in their statements in their briefs, from January 2 to

January 15, 1974, appellee purchased 111,654.24 bushels of corn in quantities as available from 1,741.43 bushels on one day to 26,222.23 on another, at the prices actually posted each day, ranging from $2.31 to $2.45.

Mead Elevator paid a total of $264,493.77 for these purchases. The prices set out in the three contracts on the quantities of corn promised to be delivered by Flamme Brothers, and not delivered, would result in totals of 74,386.24 bushels not delivered on the May 2, 1973, contract at an agreed price of $1.32 (the contract price less 2¢ per bushel patronage refund) or $98,189.84; 30,000 bushels not delivered on the May 22, 1973, contract at a price of $1.48 ($1.50 less 2¢) or $44,400; and 7,268 bushels on the October 15, 1973, oral contract at a price of $2.13 ($2.15 less 2¢) $15,480.80; or a total contract price for corn not delivered of $158,070.68. The prices actually paid to cover the purchases necessary to cover the contracts resulted therefore, as calculated above, in a deficiency of $106,423.09, and judgment was entered by the trial court in that amount.

Section 2-711, U.C.C., provides in part: "(1) Where the seller fails to make delivery * * * then with respect to any goods involved * * * the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid (a) 'cover' and have damages under the next section as to all the goods affected * * *."

Section 2-712, U.C.C., provides in part: "(1) After a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."

In the case at bar, the appellee did not go into the market and buy corn specifically to cover the contracts, but appellee did continue buying corn from its members, as was its normal practice until the three contracts were fulfilled. The trial court determined, as inherent in

its verdict and judgment for appellee, that appellee did "cover" the contract "without unreasonable delay," and under all the circumstances of this case, we affirm the trial court's judgment. Appellee did between the dates of January 2 and January 15, 1974, purchase over 111,000 bushels of corn and applied such purchases to the unfulfilled contracts. The comment following section 2-712, U.C.C., is particularly applicable to this case. That comments states, in part: "2. The definition of 'cover' under subsection (1) envisages a series of contracts or sales, as well as a single contract or sale; * * * and contracts on credit or delivery terms differing from the contract in breach, but again reasonable under the circumstances. The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective."

The offended party is not bound by hindsight, and the practice used by appellee might have resulted in lower damages if the price over the time period had declined. Instead, the price fluctuated and the net result was that the damages were slightly higher than if the entire volume of corn had been purchased on January 2, 1974, at the $2.32 price. Appellee acted in good faith and made the "cover" purchases without unreasonable delay, within the meaning of the Uniform Commercial Code.

The judgment of the District Court was correct and is affirmed.

AFFIRMED.