David E. DANGERFIELD, d/b/a Danger-field Potato Company, Plaintiff and Appellee and Cross-Appellant,

v.

Dean MARKEL, Defendant and Appellant and Cross-Appellee.

Civ. No. 9277–A.

Supreme Court of North Dakota.

April 12, 1979.

Shaft, McConn, Fisher and Thune, Grand Forks, for plaintiff and appellee and cross-appellant; argued by Patrick W. Fisher.

DePuy, O'Connor & Goulet, Grafton, for defendant and appellant and cross-appellee; argued by W. R. Goulet, Jr., Grafton.

ERICKSTAD, Chief Justice.

This appeal arises as a result of our decision in *Dangerfield v. Markel*, 252 N.W.2d 184 (N.D.1977), in which we held that Markel, a potato grower, breached a contract with Dangerfield, a potato broker, to deliver potatoes, thus giving rise to damages under the Uniform Commercial Code. On remand the district court awarded Dangerfield $47,510.16 in damages plus interest and costs less an award to Markel of $3,840.68 plus interest. Markel appeals contending, among other things, that the district court made an erroneous award of damages to Dangerfield, and Dangerfield cross-appeals for an additional $101,675 in incidental and consequential damages. We affirm the district court judgment.

The facts in this case are stated in detail in two previous appeals to this court.[1] By contract dated June 13, 1972, Markel (seller) contracted to sell Dangerfield (buyer) 25,000 cwt. of chipping potatoes during the 1972–1973 shipping season.[2] The seller al-

---

1. This case completes the *Dangerfield v. Markel* hat trick. In *Dangerfield v. Markel*, 222 N.W.2d 373 (N.D.1974), we considered the application of the Statute of Frauds and a number of other procedural matters. In *Dangerfield v. Markel*, 252 N.W.2d 184 (N.D.1977), we held that Markel breached the agreement between the parties, thus entitling Dangerfield to damages. In this case, we are asked to review the computation of damages.

2. The contract provided in part for the sale and purchase of 20,000 cwt. storage and 5,000 cwt. field "Kennebec &/or Norchip chipping potatoes at the following prices F.O.B. Red River Valley.

legedly breached the contract by refusing to deliver 15,055 cwt. of potatoes during the contract period and the buyer was allegedly forced to purchase potatoes on the open market to fulfill a contract with potato processors. As a result of this alleged breach, the buyer claimed to have suffered severe financial hardship, shortage of capital, damaged business reputation, loss of business and lessened business growth. He prayed for general damages of $56,310 and consequential damages of $101,745, less a set-off of $3,840.68 withheld by the buyer from payments due the seller for potatoes delivered. The seller counterclaimed for the $3,840.68 withheld by the buyer and for additional damages allegedly suffered as a result of the buyer's alleged breach of contract. The trial court found for the seller and the buyer appealed to this court.

In *Dangerfield, supra*, we determined that the seller had breached the contract; consequently, we reversed and remanded the case to the trial court for a determination of damages under the Uniform Commercial Code. Following the remand to the trial court, the judge who had heard the case at the trial level disqualified himself after receiving a letter from the buyer's attorney that questioned his ability to make an unbiased and impartial determination of damages after awarding the buyer no damages initially. Another judge was subsequently assigned the case and in a memorandum decision dated December 16, 1977, he awarded the buyer general damages of $35,197.08 plus incidental damages of $19.50, less the seller's counterclaim of $3,840.68. On December 23, 1977, the buyer moved to amend this award pursuant to Rule 52(b), N.D.R.Civ.P., and on June 14, 1978, the trial court awarded the buyer $47,510.16 plus interest and costs less an award to the seller of $3,840.68 plus interest.[3]

In substance, the seller argues three issues on appeal: (1) The trial court made an erroneous award of damages to the buyer. (2) The original trial judge should not have disqualified himself where the proceedings were a continuation of those previously heard by the judge. (3) The trial court erred in granting the buyer's motion to amend the court's findings pursuant to Rule 52(b), N.D.R.Civ.P., prior to the entry of a formal judgment.

The buyer cross-appeals contending that the trial court's determination that it had failed to prove incidental and consequential damages as a result of the seller's breach of contract is clearly erroneous.

The primary issue on this appeal is whether or not the trial court made an erroneous award of damages to the buyer under the Uniform Commercial Code. The trial court in essence found that the buyer was entitled to damages pursuant to Section 41–02–91, N.D.C.C. (§ 2–712, U.C.C.) for the amount expended by the buyer to purchase the 15,055 cwt. of potatoes still due under the contract:

"It appears to the Court that the Defendant [seller] . . . should be liable for the difference in price including freight, if any, between the quantity of the potatoes remaining to be delivered under the . . . contract after February 10, 1973 [date of breach], and the price including freight, if any, that the plaintiff [buyer] actually paid for potatoes to 'cover' the supply that the plaintiff, Dangerfield, had a right to expect to be delivered . . . under . . . [the] contract during the remainder of the 1972–73 potato shipping season."

The court determined that the buyer completed "covering" the contract on

| FIELD | |
|---|---|
| | $1.25 |
| Nov. | $1.60 |
| Dec. | $1.65 |
| Jan. | $1.80 |
| Feb. | $1.90 |
| March | $2.00 |
| April | $2.15 |
| May | $2.30" |

The contract did not specify a monthly delivery date nor a specific quantity to be delivered each month.

**3.** Although the district court amended the damage award it did so on its own grounds. Apparently the initial damage award was erroneously computed and the amendment corrected the mistake.

March 21, 1973, which was 38 days after the date of breach. During the first eighteen days of this cover period, the buyer's purchases averaged $4.41 per cwt. During the remaining twenty days, the buyer's purchases averaged over $5.41 per cwt., with many purchases made at $6.00 per cwt.

Seller argues in substance that thirty-eight days for the buyer to cover in a rapidly rising market is improper under Sections 41–02–90 and 41–02–91, N.D.C.C. (§§ 2–711 and 2–712, U.C.C.); therefore, he submits that Section 41–02–92, N.D.C.C. (§ 2–713, U.C.C.) should have been used to compute damages.

Section 41–02–90, N.D.C.C., provides in part:

"*Buyer's remedies in general—Buyer's security interest in rejected goods.—*1. Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (section 41–02–75), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid

    a. 'cover' and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or

    b. recover damages for nondelivery as provided in this chapter (section 41–02–92)."

Section 41–02–91, N.D.C.C., provides:

"41–02–91. (2–712) *'Cover'—Buyer's procurement of substitute goods.—*

"1. After a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

"2. The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (section 41–02–94), but less expenses saved in consequence of the seller's breach.

"3. Failure of the buyer to effect cover within this section does not bar him from any other remedy."

Section 41–02–92, N.D.C.C., provides:

"41–02–92. (2–713) *Buyer's damages for nondelivery or repudiation.—*

"1. Subject to the provisions of this chapter with respect to proof of market price (section 41–02–102), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this chapter (section 41–02–94), but less expenses saved in consequence of the seller's breach.

"2. Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival."

The seller submits that the market price at the time of the breach was between $3.75 and $4.25 per cwt. He argues that a proper measure of damages pursuant to Section 41–02–92, N.D.C.C., would be an average of $4.00 per cwt. minus the contract price at the time of the breach ($1.90), or damages of $31,615.50 as opposed to the present award of $47,510.16, a reduction of $15,894.66.

The buyer responds that due to the perishable nature of the product involved in this case and the installment nature of the contract, the cover period was not unreasonable pursuant to Section 41–02–91, N.D.C.C.; therefore, the damages are correct.

The pre-code measure of damages for a breach of contract for the sale of goods was to allow the aggrieved party the difference between his bargain (contract price) and the market price. Although this worked reasonably well in the majority of cases, practical problems arose in determining the market price as well as the related questions of "as of when" and "where". After the seller's breach, the buyer faced a dilemma, *i. e.*

to ensure that he would be fully compensated for the seller's breach, the buyer had to make a substitute purchase that the finder of fact would later determine to be at the "market value". This "20–20 hindsight approach" by the factfinder produced questionable results. Therefore, Section 2–712, U.C.C., [Section 41–02–91, N.D.C.C.] was added to the buyer's arsenal of remedies. This section allows the buyer to make a substitute purchase to replace the goods that were not delivered by the seller and the damages are measured by the difference between the cost of the substitute goods and the contract price. *See* J. WHITE & R. SUMMERS, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL CODE 175–180 (1972); R. NORDSTROM, HANDBOOK OF THE LAW OF SALES 439–44 (1970); T. QUINN, UNIFORM COMMERCIAL CODE COMMENTARY AND LAW DIGEST, 2–445–2–448 (1978).

The official comment to Section 2–712, U.C.C., states that "the test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective."

■ In order for Section 2–712, U.C.C., to apply, the buyer must make a reasonable purchase in good faith without unreasonable delay. If a buyer fails to cover or covers improperly, *e. g.* waits an unreasonable length of time or buys in bad faith, he may still be entitled to some relief.

The seller argues that the buyer's purchases did not satisfy the criteria of Section 2–712, U.C.C.; therefore, he is limited to the traditional measure of damages. Specifically, the seller argues that the buyer was obligated to purchase the entire cover on the date of the breach or shortly thereafter in order to mitigate his damages.

■ Although we have not dealt directly with the question of proper cover pursuant to Section 2–712, U.C.C., we stated in *Jamestown Terminal Elevator, Inc. v. Hieb*, 246 N.W.2d 736, 738 (N.D.1976), at Syl. ¶ 10 that the "determination of a reasonable time to 'cover' following a breach of contract rests in the discretion of the jury and generally will not be interfered with on appeal where there is substantial evidence to sustain the verdict." Although there was no jury present in this case, the question of reasonable time to cover following a breach of contract is still a question of fact and we are governed by the "clearly erroneous" standard of Rule 52(a), N.D.R.Civ.P.

■ Similarly, the criteria of good faith and reasonable purchase are also questions of fact and will not be set aside unless clearly erroneous. *See Transammonia Export Corp. v. Conserv., Inc.*, 554 F.2d 719 (5th Cir. 1977); *Kiser v. Lemco Industries, Inc.*, 536 S.W.2d 585 (Tex.Civ.App.1976).

The record indicates that the buyer could not cover the balance of the contract on the date of the breach:

"Q. Once you learned you were not going to receive any more potatoes from Mr. Markel in February of 1973, did you attempt to buy potatoes to cover the shortage on the contract?

"A. I did.

"Q. Were you able to go out right at that time on February 12th or 13th, and buy quantity to cover the remaining balance on the contract?

"A. No, I was not able to.

"Q. Why was this?

"A. Well, we were continuing on rising market, no one wanted to commit more than one or two loads at any one time, so would load on basis whatever day they got car, they would accept whatever market was at that day.

"Q. If I understand what you are saying correctly, is that potatoes that were available at that time had to be bought and you would have to take delivery and ship them, that what you mean?

"A. That's correct.

"Q. That's correct?

"A. Right.

"Q. You were not able to buy potatoes in February for delivery in May?

"A. No.

"Q. Were you able to buy potatoes in middle of February for delivery say a month or two later?

"A. No.

"Q. Did you try to do this?

"A. Yes."

Furthermore, the trial court was obviously of the opinion that the buyer acted in good faith under the circumstances:

"Based upon the foregoing facts and the Uniform Commercial Code as quoted above, the Court is of the opinion that the plaintiff having elected to 'cover' the defendant's breach was not obliged to purchase the entire cover as of the date of the breach since this contract called for installment deliveries over a period of months during the 1972, 1973 potato shipping season. In the absence of a showing of plaintiff so as to increase his damages against the defendant, the Court will view as reasonable a course of purchases of cover stocks from time to time. This ruling is particularly called for in this case where the subject of the contract is a bulky perishable commodity and the quantities must be warehoused at carefully controlled temperatures to avoid freezing or undue deterioration in holding. It would be unreasonable under these circumstances to hold the covering buyer to a February 10, 1973, market price date for immediate delivery of the entire amount of cover necessary to complete the contract of sale. This is particularly true where, as here, the quantity and bulk of goods in question is large and where the goods normally would flow into commerce upon delivery rather than into storage."

█ It is generally accepted that if the buyer complies with the requirements of Section 2–712, U.C.C., his purchase is presumed proper and the burden of proof is on the seller to show that cover was not properly obtained. *Kiser v. Lemco Industries, Inc., supra* at 589; *Laredo Hides Co., Inc. v. H & H Meat Products Co., Inc.*, 513 S.W.2d 210, 221 (Tex.Civ.App.1974).

In *Laredo*, a Texas Court of Appeals was presented with a similar question. The buyer sued the seller to recover damages for breach of contract for the sale of cattle hides. The buyer agreed, pursuant to the contract, to purchase the seller's entire cattle hide production from March through December 1972. The contract provided no specific quantity but provided that deliveries be made at least twice a month. On March 3, 1972, the first delivery of hides was made under the contract. On March 21, 1972, the seller refused to sell any more hides to the buyer because of a payment dispute. The Texas court found that the seller had waived any objection and therefore breached the contract. The buyer was forced to purchase hides on the open market in substitution for the hides that were to have been delivered under the contract. The court awarded damages to the buyer for the substitute purchase minus the contract price, even though the cover "purchases had to be made periodically throughout 1972 since Laredo Hides [buyer] had no storage facilities, and the hides would decompose if allowed to age," and even though "the market price for hides steadily increased following the execution of the contract in question."

In *Farmer's Union Co-op Co. of Mead v. Flamme Bros.*, 196 Neb. 699, 245 N.W.2d 464 (1976), the Supreme Court of Nebraska was presented with a similar situation in which the seller argued that the buyer should not have been allowed to cover a breached corn contract over a 15-day-period in a rising market.

The Nebraska court rejected the argument:

"In the case at bar, the appellee did not go into the market and buy corn specifically to cover the contracts, but appellee did continue buying corn from its members, as was its normal practice until the three contracts were fulfilled. The trial court determined, as inherent in its verdict and judgment for appellee, that appellee did 'cover' the contract 'without unreasonable delay,' and under all the circumstances of this case, we affirm the

trial court's judgment. Appellee did between the dates of January 2 and January 15, 1974, purchase over 111,000 bushels of corn and applied such purchases to the unfulfilled contracts. The comment following section 2–712, U.C.C., is particularly applicable to this case. That comment states, in part: '2. The definition of "cover" under subsection (1) envisages a series of contracts or sales, as well as a single contract or sale; * * * and contracts on credit or delivery terms differing from the contract in breach, but again reasonable under the circumstances. The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective.'

"The offended party is not bound by hindsight, and the practice used by appellee might have resulted in lower damages if the price over the time period had declined. Instead, the price fluctuated and the net result was that the damages were slightly higher than if the entire volume of corn had been purchased on January 2, 1974, at the $2.32 price. Appellee acted in good faith and made the 'cover' purchases without unreasonable delay, within the meaning of the Uniform Commercial Code." 196 Neb. at 706, 245 N.W.2d at 468.

See also Annot., *Buyer's Right to "Cover" By Purchasing Goods Elsewhere on Seller's Breach Under U.C.C. § 2–712*, 64 A.L.R.3d 246 (1975); Annot., *Good Faith and Commercial Reasonableness of Buyer's Cover Following Seller's Breach of Sales Contract*, 12 P.O.F.2d 145 (Am.Jur.) (1977). We are mindful of the Code's basic remedial message in Section 41–01–06, N.D.C.C., (§ 1–106 U.C.C.) to put the aggrieved party in the position performance would have. White and Summers, in their Hornbook series on the Uniform Commercial Code, comment on Sections 1–106 and 2–712:

"If 2–712 is to be the remedy used by more aggrieved buyers than any other remedy, then the courts must be chary of finding a good faith buyer's acts unreasonable. The courts should not hedge the remedy about with restrictions in the name of 'reasonableness' that render it useless or uncertain for the good faith buyer. Indeed, one may argue that the courts should read very little substance into the reasonableness requirement and insist only that the buyer proceed in good faith. A question a lawyer might put to test his client's good faith under 2–712 is this: 'How, where, and when would you have procured these goods if you had not been covering and had no prospect of a court recovery from another?' If the client can answer truthfully that he would have spent his own money in the same way, the court should not demand more." J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code, at p. 178.

■ We do not feel that the seller met his burden of showing that cover was improperly obtained in this case or that the district court's findings were clearly erroneous. Consequently, we affirm the district court judgment on this issue.

■ The seller next argues that the original trial judge should not have disqualified himself from determining the damage award in this case. The seller contends that the judge disqualified himself after receiving a letter from the buyer's attorney that questioned his ability to make an impartial award of damages after awarding the buyer no damages initially. He argues that this letter was in essence a demand for change of judge pursuant to Section 29–15–21, N.D.C.C., and therefore should have been denied as not being timely made. Section 29–15–21, N.D.C.C., provides in relevant part:

"*Demand for change of judge.—*

"1. Subject to the provisions of this section, any party to a civil or criminal action or proceeding pending in the district court of any county in this state may obtain a change of the judge before whom the trial or any proceeding with respect thereto is to be heard, by filing with the clerk of

the court in which the action or proceeding is pending a written demand for change of judge, executed in triplicate by the personal signature of the party, if an individual, and by personal signature of an authorized officer, if a corporation or association.

"2. The demand is not operative unless it is filed with the clerk of the court at least three days before the matter is to be heard if upon a motion or upon arraignment, or ten days before the date the action or proceeding is scheduled for trial. In any event, no demand for a change of judge may be made after the judge sought to be disqualified has ruled upon any matter pertaining to the action or proceeding in which the demanding party was heard or had an opportunity to be heard." § 29–15–21(1), (2), N.D.C.C.

The seller also argues that original judge's disqualification "denied Markel a full and fair trial in that the credibility of the witnesses could no longer be considered on the remand of this action."

The buyer responds that the original judge in this action disqualified himself pursuant to the Code of Judicial Conduct, Canon 3c(1) which provides that "a judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . . ." The buyer also argues that the appointment of another judge by the North Dakota Supreme Court to determine the question of damages is not appealable at this time.

We find the seller's contention regarding the change of judge to be without merit. When a district judge concludes that his impartiality might reasonably be questioned, and he accordingly disqualifies himself, the Supreme Court has the authority pursuant to Section 95 of the North Dakota Constitution and Sections 27–02–05.1 and 29–15–21, N.D.C.C., to assign an alternate judge. This assignment cannot be challenged at this time.

■ The seller's remaining contention is that the trial court erred in granting the buyer's motion to amend the court's findings pursuant to Rule 52(b), N.D.R.Civ.P., prior to the entry of a formal judgment.

Rule 52(b) provides:

"RULE 52.—FINDINGS BY THE COURT

\* \* \* \* \* \*

"(b) *Amendment.* Upon motion of a party made not later than 10 days after notice of entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may be made with a motion for a new trial pursuant to Rule 59. When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the district court an objection to such findings or has made a motion to amend them or a motion for judgment."

Although the rule provides that a motion pursuant to Rule 52(b) must be made not later than ten days after notice of entry of judgment, there is no requirement that a party must wait until judgment has been entered. *See* 9 Wright & Miller, Federal Practice and Procedure: Civil § 2582 and cases cited therein.

■ The remaining issue to be considered is the buyer's cross-appeal for consequential damages pursuant to Section 41–02–94, N.D.C.C. (§ 2–715 U.C.C.). Section 41–02–94 provides:

"*Buyer's incidental and consequential damages.*—1. Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"2. Consequential damages resulting from the seller's breach include

a. any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

b. injury to person or property proximately resulting from any breach of warranty."

The buyer contends that as a result of the seller's breach, he suffered consequential damages in the amount of $101,675 due to his severe financial hardship, shortage of capital, damaged business reputation, loss of business, and lessened business growth.

The district court found that the buyer failed to prove these damages:

"The Court finds that the plaintiff has otherwise failed in his burden of proof as to 'incidental' or as to 'consequential' damages are defined in Section 41-02-94 (2-715) N.D.Cent.Code, quoted in full above. It provides for recovery of consequential damages resulting from the seller's breach including, 'any loss resulting from general or particular requirements and needs of *which the seller at the time of contracting had reason to know and which could* not reasonably be prevented by cover or otherwise, * * *.'

"Here 'cover' was effected and plaintiff is entitled to recover for his excess costs as they were incurred therefor as general damages. He is not on this record entitled to more. The defendant cannot be held to be the guarantor of the plaintiff's subsequent standing as a potato broker, . . . or of the plaintiff's subsequent financial success, . . . particularly when the defendant's breach represents but a small fraction of the plaintiff's brokerage of activity in the Red River Valley for the subject season to say nothing of the volume of his operations in Arizona and Wisconsin.

"The defendant's breach did not put the plaintiff out of business nor did it appear to materially impede his operations for the remainder of the shipping season. Conceivably he might have dealt even more actively in chipping potatoes during the remainder of the season had he not have had to obligate himself for higher than contract prices on cover stocks. However, it does not show affirmatively that he paid for his cover purchases until after receiving payment from his own processor customers. The sums received by Dangerfield from his sales of the 'cover' stock purchases itemized above shows that the plaintiff earned a $990.32 gain on these particular shipments. . . .

"The Court has read and considered the entire transcript of the trial proceedings and has similarly examined all the exhibits and briefs of the parties from that record and arguments of counsel. The Court finds that the plaintiff is entitled to damages as shown above in the amount of $47,490.96 plus proven incidental damages of $19.50 and is not entitled to consequential damages in any amount." [Emphasis in original.]

Buyer has cited no authority that would allow consequential damages in the circumstances present here and we are not left with the definite and firm conviction that mistake has been made. *Haugeberg v. Haugeberg,* 258 N.W.2d 657 (N.D.1977). Consequently, we do not find the district court's findings to be clearly erroneous pursuant to Rule 52(a), N.D.R.Civ.P.

The district court's judgment is affirmed in all respects.

SAND, PAULSON, PEDERSON and VANDE WALLE, JJ., concur.