TRINIDAD BEAN AND ELEVATOR COMPANY, A COLORADO CORPORATION, APPELLANT, V. ELMO FROSH, APPELLEE.

494 N.W.2d 347

Filed October 13, 1992.    No. A-90-1099.

Tim W. Thompson, of Kelley, Scritsmier & Byrne, P.C., for appellant.

Stephen W. Kay, of Kay & Kay, for appellee.

SIEVERS, Chief Judge, and CONNOLLY and MILLER-LERMAN, Judges.

CONNOLLY, Judge.

This is a case regarding the sale of goods brought under the Uniform Commercial Code. Trinidad Bean and Elevator Company (Trinidad) brought suit against Elmo Frosh for damages based on breach of a contract for the sale of beans. Trinidad appeals a jury verdict for Elmo Frosh. We affirm.

## FACTS

Trinidad is a Colorado corporation which owns and operates an elevator located in Imperial, Nebraska. Elmo Frosh is an individual engaged in the business of farming.

On or about April 26, 1988, Elmo Frosh entered into a written contract with Trinidad, whereby Trinidad agreed to buy and Frosh agreed to sell 1,875 hundredweight of dried, edible navy beans, which were to be delivered to Trinidad at Imperial upon completion of the harvest of the 1988 crop. The written

contract entered into by the parties on April 26, at paragraph 7, provided for two options with respect to payment to Elmo Frosh. Option 1 provided for payment of $16.25 per hundredweight on January 15, 1989, and option 2 provided for 50-percent payment at $16 per hundredweight upon the completion of the harvest and for 50-percent payment at $16 per hundredweight on December 1, 1988. Option 1 would be selected if a grower wished to defer income for tax purposes, and option 2 would be used if the grower wished immediate payment.

Dirk Buffington, who had been employed with Trinidad only 1 month when he prepared the Frosh agreement, inadvertently filled out both payment options. The error was first noticed by James Peterson, a commodity trader, when the contract was received in Trinidad's Denver office. James Peterson contacted the Imperial elevator and asked that someone ascertain which option Elmo Frosh intended so that Trinidad's accounting department could process the contract.

James Peterson spoke with Roberta Frosh, Trinidad's secretary at the Imperial elevator, and alerted her to the problem. Roberta Frosh had been the bookkeeper and secretary at the Imperial office for 10 years and was the wife of the defendant, Elmo Frosh.

Buffington testified that Roberta Frosh had alerted him to the error and told him to prepare a second page, limiting the payment provision to option 2. Buffington testified that he gave the second page to Roberta Frosh to obtain defendant's signature. Roberta Frosh admitted that she knew about the second page of the contract, but denied that anyone from Trinidad had requested that she obtain defendant's signature.

Elmo Frosh testified that on approximately May 1, 1988, he told Larry Peterson, the elevator manager at Imperial, to tear up the contract. Larry Peterson testified that Elmo Frosh never made the statement. It is undisputed that a contract with only one payment option was never signed. It is also undisputed that on or about May 1, the contract and market prices for edible navy beans were the same.

On August 31, 1988, Elmo Frosh went to the elevator office and asked Buffington whether the contract had been torn up.

On September 8, Elmo Frosh sent a letter to James Peterson at the Denver office, in which letter Frosh stated that he felt the contract was void.

Harvest was completed in mid-October, and no beans were delivered as promised in the contract. Because of drought conditions, the price of navy beans rose during the 1988 growing season from $16 per hundredweight in April, to $32 per hundredweight in late August to early September, and to $36 per hundredweight in late September, when Trinidad purchased beans from other sources.

The court instructed the jury that a contract existed, that the measure of damages was the price of the beans at the time of performance minus the contract price, that the time of performance was harvesttime, and that Elmo Frosh might be entitled to the defenses of mitigation of damages and Trinidad's failure to "cover" within a commercially reasonable time after repudiation. The jury returned a general verdict for Elmo Frosh. Trinidad filed a motion for judgment notwithstanding the verdict or, in the alternative, for new trial, which motion was overruled. Trinidad now appeals to this court.

## ASSIGNMENTS OF ERROR

On appeal, Trinidad assigns that the district court erred (1) in not sustaining Trinidad's motion for directed verdict; (2) in not sustaining Trinidad's posttrial motion for new trial or for judgment notwithstanding the verdict, for the reason that the verdict rendered by the jury was contrary to law and contrary to the evidence; and (3) in instructing the jury that Trinidad had a duty to mitigate damages.

## MEASURE OF DAMAGES

In its first assignment of error, Trinidad claims that the court erred in not sustaining its motion for directed verdict. This assignment will be considered together with the second assignment, which is based on the trial court's failure to sustain Trinidad's posttrial motion for judgment notwithstanding the verdict and new trial.

A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. The

party against whom a motion for directed verdict is made is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Baker v. St. Paul Fire & Marine Ins. Co.*, 240 Neb. 14, 480 N.W.2d 192 (1992).

On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the material and relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences which can be deduced therefrom. *Pugh v. Great Plains Ins. Co.*, 239 Neb. 171, 474 N.W.2d 677 (1991). A jury verdict will not be disturbed unless it is clearly wrong. See *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990).

The standard of review of an order granting a new trial is whether the trial court abused its discretion. A motion for new trial should be granted only where there is error prejudicial to the rights of the unsuccessful party. Unless such error appears, a party who has sustained the burden and expense of trial, and who has succeeded in securing a verdict on the facts in issue, has a right to keep the benefit of that verdict. *Kumar v. Douglas County*, 234 Neb. 511, 452 N.W.2d 21 (1990).

In its instructions, the court stated:

INSTRUCTION NO. 5

If you find in favor of the plaintiff on its claim for breach of contract, then you must determine the amount of plaintiff's damages.

The plaintiff is entitled to recover the market price of the beans purchased at the time the plaintiff learned of the breach minus the contract price and minus any reduction you find by virtue of the defendant's defenses.

INSTRUCTION NO. 6

The language "at the time [the plaintiff learned] of the breach" refers to the time in which performance by the seller was required under the contract. In this case the time of performance required under the contract is at the time

of harvesting the bean crop involved in this action.

### INSTRUCTION NO. 7

If you assess damages, then you must consider the defendant's claim that the plaintiff failed to take reasonable steps to minimize its damages. The defendant is not liable for any damages that could reasonably have been prevented if the plaintiff had done so. The defendant has the burden of proving that the plaintiff failed to take reasonable steps to minimize its damages.

### INSTRUCTION NO. 8

The defendant claims that the plaintiff awaited performance beyond a commercially reasonable time after repudiation. This is called an anticipatory repudiation.

Anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance. However, it is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation.

Trinidad argues that the court ought to have sustained its motion for judgment notwithstanding the verdict or new trial for two reasons: (1) the jury could easily have ascertained the amount of Trinidad's damages at the time of harvest, since exhibit 3 was in evidence to show that at the time of harvest in mid-October 1988, edible beans were selling for $37 to $38 per hundredweight and (2) the jury was wrongly instructed that it should apply the defense of mitigation of damages to reduce Trinidad's recovery.

These assignments of error require us to determine the measure of a buyer's damages under Neb. U.C.C. § 2-713(1) (Reissue 1980) upon anticipatory repudiation, a question which "presents one of the most impenetrable interpretive problems in the entire Code." 1 James J. White & Robert S. Summers, Uniform Commercial Code § 6-7 at 320 (3d ed. 1988). Specifically, the question is whether the language "at the time when the buyer learned of the breach," § 2-713(1), refers to the

time when the seller repudiated or the time when the performance came due.

This is not an issue of first impression, since the Supreme Court considered § 2-713 in *Burgess v. Curly Olney's, Inc.*, 198 Neb. 153, 251 N.W.2d 888 (1977). However, that opinion did not settle how § 2-713 ought to be interpreted in an anticipatory repudiation case.

In *Burgess*, the plaintiffs signed a purchase agreement to buy three combines for $2,200 on November 30, 1973. The plaintiffs paid $200 down, with the balance due upon delivery. On February 20, 1974, the defendant sold the three combines and a hay bailer to a third party for $3,400 and notified the plaintiffs that the downpayment was being returned. At trial, the plaintiffs claimed that the combines were worth $7,000 on February 20, based on a loan value booklet, but the court found that there was no opinion evidence to show the condition of the particular equipment and awarded the plaintiffs $200, the amount of the downpayment. The Supreme Court affirmed and stated that "[u]nder the provisions of section 2-713, U. C. C., the measure of damages for nondelivery or repudiation by the seller is the difference between the market price and the contract price at the place of tender at the time the buyer learned of the breach." *Burgess*, 198 Neb. at 158, 251 N.W.2d at 891. The court held that the evidence was such that the district court could have found that the plaintiffs had not proved their damages under the standard.

*Burgess* does not resolve the issue in the case at bar because in *Burgess* the plaintiffs learned of the repudiation at the time when they learned that the goods would not be delivered. Since the dates of repudiation and nondelivery happened to coincide in *Burgess*, that case left the question of repudiation before the date of performance unsettled. Therefore, we must determine the measure of a buyer's damages in a case of anticipatory repudiation.

Neb. U.C.C. § 2-610 (Reissue 1980) provides that an aggrieved party may

(a) for a commercially reasonable time await performance by the repudiating party; or

(b) resort to any remedy for breach (Section 2-703 or

Section 2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(c) in either case suspend his own performance . . . .

Section 2-610(b) provides a remedy for breach of contract before the time of performance has arrived. If a buyer chooses to treat the repudiation as a breach, he may proceed under Neb. U.C.C. § 2-711 (Reissue 1980). Section 2-711(1) provides that the buyer may cancel and recover any amount paid to the seller, as well as seek damages for cover, see Neb. U.C.C. § 2-712 (Reissue 1980), or the contract-market differential, see Neb. U.C.C. § 2-713 (Reissue 1980). Upon the breach of a contract for the sale of an article, a buyer is not required to effect the remedy of cover under § 2-712, but may recover damages for nondelivery.

In this case, Trinidad chose not to cover and sought damages for the contract-market differential under § 2-713(1), which provides:

Subject to the provisions of this article with respect to proof of market price (Section 2-723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price *at the time when the buyer learned of the breach* and the contract price . . . .

(Emphasis supplied.)

The key question this court must determine on appeal is whether "learned of the breach" refers to time of repudiation or time of performance. The trial court found that damages were to be measured at the time of performance and so instructed the jury; however, the court also instructed the jury to consider whether Trinidad awaited performance unreasonably after Elmo Frosh's anticipatory repudiation.

An appellate court examines an instruction to determine whether it is a correct statement of law. *Worth v. Schillereff*, 233 Neb. 628, 447 N.W.2d 480 (1989).

Regarding a question of law, an appellate court has an obligation to reach a conclusion independent from the conclusion reached by the trial court. *Nebraska Builders Prod. Co. v. Industrial Erectors*, 239 Neb. 744, 478 N.W.2d 257 (1992).

The word "breach" as used in § 2-713(1) is ambiguous and must be interpreted within its statutory setting. There are essentially two views as to how the ambiguity is to be interpreted: (1) "learned of the breach" refers to time of repudiation or (2) "learned of the breach" refers to time of performance under the terms of the parties' contract. But see *First Nat. Bank of Chicago v. Jefferson Mtg. Co.*, 576 F.2d 479 (3d Cir. 1978) (adopting a third approach). Plausible arguments support both interpretations.

*Time of Repudiation.*

The most common interpretation, accepted by a majority of courts, is that Code § 2-713(1) refers to time of repudiation. This interpretation was adopted in the leading case of *Oloffson v. Coomer*, 11 Ill. App. 3d 918, 296 N.E.2d 871 (1973). In *Oloffson*, the buyer contracted with the seller-farmer for delivery of corn in 1970. In June 1970, the seller notified the buyer that he was not planting corn because of weather conditions and that he would not deliver. In September, the buyer again asked the seller about delivery of the corn, and the seller repeated that he would not be able to deliver. The buyer refused to cover and urged performance even though he knew there would be none. The Illinois Appellate Court refused to award damages based on the September price, but based its award on the price of corn on the June date, when the seller notified the buyer that he would not deliver. In so doing, the court pointed out that there was an easily accessible market for purchase of the grain and that the words "for a commercially reasonable time," appearing in Code § 2-610(a), relating to anticipatory repudiation, "must be read relatively to the obligation of good faith that is defined in Section 2-103(1)(b) and imposed expressly in Section 1-203." 11 Ill. App. 3d at 922-23, 296 N.E.2d at 875.

*Time of Performance.*

The performance date measurement is preferred by White and Summers. See 1 White & Summers, *supra*. The performance date measurement was adopted in *Cargill, Inc. v. Stafford*, 553 F.2d 1222 (10th Cir. 1977), in which the court reasoned that before the adoption of the Code, damages were

measured from the time when performance was due and not from the time when the buyer learned of repudiation.

The court also noted that in Code § 2-723(1), providing for the measure of damages in a suit for anticipatory repudiation which comes to trial before the time for performance, the drafters stated, " '[A]ny damages based on market price . . . shall be determined according to the price of such goods prevailing at the time when the aggrieved party learned of the repudiation.' " (Emphasis omitted.) *Cargill, Inc.*, 553 F.2d at 1226. The court reasoned that when the Code drafters intended to base damages on the date a party "learned of the repudiation," they did so by explicit language.

*Analysis of the Alternatives.*

Since the Code's vocabulary is not consistent, both of these interpretations appear equally plausible. However, for the following reasons, we conclude that the repudiation date interpretation gives the provisions their best combined effect.

It must be conceded that the performance date interpretation has the advantage of achieving consistency between § 2-713 and Neb. U.C.C. § 2-708 (Reissue 1980), the section containing the seller's market-based remedy for a buyer's anticipatory repudiation. Section 2-708 establishes the performance date as the proper time for measuring a seller's damages. The performance date argument draws additional support from Neb. U.C.C. § 2-723 (Reissue 1980), which expressly refers to both § 2-708 and § 2-713.

The shortcoming of the performance date interpretation is that it fails to explain § 2-610(a), which appears to allow an aggrieved party to await performance only "for a commercially reasonable time." As one court has said: "If buyer is entitled to market-contract damages measured at the time of performance, it is difficult to explain why the anticipatory repudiation section limits him to a commercially reasonable time to await performance." *Cosden Oil v. Karl O. Helm Aktiengesellschaft*, 736 F.2d 1064, 1072 (5th Cir. 1984).

We are also persuaded that pre-Code law is irrelevant. Under the common law, a buyer in anticipatory repudiation cases was privileged to await a seller's performance until the date

performance was scheduled under the contract. See *Fahey v. Updike Elevator Co.*, 102 Neb. 249, 166 N.W. 622 (1918). An aggrieved buyer was under no duty to enter into substitute transactions such as buyer's cover or seller's resale. See, e.g., *Reliance Cooperage Corp. v. Treat*, 195 F.2d 977, 983 (8th Cir. 1952). This was also the rule under § 67 of the Uniform Sales Act. However, prior law was changed by § 2-610(a), which allows an aggrieved party to await performance only "for a commercially reasonable time." Section 2-610(a) substitutes a commercial standard for a legal standard.

Moreover, the policy behind the commercial reasonableness of § 2-610(a) is to compensate a buyer based on the prevailing market. The goal in sales contract cases should be to compensate an aggrieved buyer in whole and this is accomplished by the Code's policy on cover. "[M]easuring buyer's damages at the time of performance will tend to dissuade the buyer from covering, in hopes that market price will continue upward until performance time." *Cosden Oil*, 736 F.2d at 1072. When a performance measure is applied, an aggrieved buyer in a rising market will speculate that prices will continue to rise. If the market falls after repudiation, the buyer will obtain the same goods at a price lower than under the contract. The effect is to overcompensate the buyer and penalize the seller. See Thomas H. Jackson, *"Anticipatory Repudiation" and the Temporal Element of Contract Law: An Economic Inquiry into Contract Damages in Cases of Prospective Nonperformance*, 31 Stanford L. Rev. 69 (1978).

Our interpretation is also influenced by § 2-712, under which a buyer may cover by making in good faith any reasonable purchase of substitute goods, so long as he does not delay unreasonably. See *Farmer's Union Co-op Company of Mead v. Flamme Brothers*, 196 Neb. 699, 245 N.W.2d 464 (1976). If the performance measure is correct, then "in a rising market, no reason would exist for requiring the buyer to act 'without unreasonable delay' when he seeks to cover following an anticipatory repudiation." *Cosden Oil*, 736 F.2d at 1072.

*Holding.*

We conclude that best effect is given to the statutes if

"learned of the breach," in § 2-713(1), refers to the time the buyer learned of the seller's repudiation. Therefore, we hold that the measure of damages for a buyer upon anticipatory repudiation by the seller is the difference between the contract price and the price of the goods on the date of repudiation, so long as it would be commercially reasonable for the buyer to cover on the date of repudiation. Conditioning the repudiation date measurement on commercial reasonableness is required by § 2-712(3): "Failure of the buyer to effect cover within this section does not bar him from any other remedy." However, an aggrieved buyer ought to bear the burden of showing that it was commercially unreasonable for him to cover on the repudiation date.

*Application.*

Having determined that date of repudiation is the correct date for measurement of damages, we must determine when repudiation took place in the case at bar.

Comment 1 to § 2-610 states that "[a]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *Crowder v. Aurora Co-op Elev. Co.*, 223 Neb. 704, 712-13, 393 N.W.2d 250, 257 (1986). See, also, Annot., 1 A.L.R.4th 527 (1980).

According to Elmo Frosh's testimony, he entered the Imperial facility in early May and directed Larry Peterson to tear up the contract because Frosh wanted no contract. If true, Elmo Frosh's testimony proves that an overt communication of intention not to continue with the contract occurred in May. Therefore, repudiation would have occurred in early May.

The gist of Trinidad's argument for directed verdict and judgment notwithstanding the verdict is that it was insignificant that Elmo Frosh repudiated because, even if he did, Trinidad was entitled to await performance under § 2-713. Further, damages were to be calculated at the time Trinidad learned of the breach. Trinidad argues that the breach occurred when performance was due and that Trinidad thereafter had a reasonable time to cover.

Since the factual issues of the time of Elmo Frosh's

repudiation and the reasonableness of Trinidad's delay could not be decided as a matter of law, a directed verdict was not warranted. Moreover, since on a motion for judgment notwithstanding the verdict, the moving party is deemed as having admitted as true all relevant evidence favorable to the nonmoving party and the nonmoving party must be given the benefit of every favorable inference, Elmo Frosh's repudiation occurred in early May, when the contract and market price were identical. The jury's finding in favor of Elmo Frosh was not clearly wrong.

The gravamen of Trinidad's assignment of error based on the trial court's overruling its motion for new trial is that the court erred by instructing on mitigation. In the next part, we conclude that it was error for the court to instruct on mitigation. However, we note here that even if it was error for the court to instruct on both the performance date and mitigation, Trinidad was not prejudiced by the error.

Our review of an order granting a new trial is for abuse of discretion, and the motion should only be granted where there is error prejudicial to the rights of an unsuccessful party. In the case at bar, the effect of giving the instruction on mitigation was no different than giving the instruction on anticipatory repudiation, since in either case the jury could have found that Trinidad ought to have mitigated—or effected cover—on the date of repudiation. Since the jury could have found for Elmo Frosh even if the erroneous instruction had not been given, the error was not prejudicial to Trinidad.

Since Trinidad has not shown how giving instruction No. 7 to the jury was prejudicial to Trinidad, it was not an abuse of discretion for the trial court to overrule Trinidad's motion for new trial.

Finally, Trinidad argues in its brief that even if the jury found that repudiation occurred in early May, it would be commercially reasonable for Trinidad to wait 4 months because the futures market for edible beans was fluctuating daily. "Because of the nature of forward contracting any commodity, the reasonableness of purchasing commodities to cover the amount of a commodity in a repudiated contract will always be questionable." Brief for appellant at 29. We are not persuaded

by Trinidad's argument.

We have held that if an aggrieved buyer claims it was reasonable to delay after repudiation, he has the burden of showing that it was commercially unreasonable to cover on the date of repudiation. As we interpret the Code, its policy is to make an aggrieved buyer whole. The Code was not enacted to encourage or reward speculative behavior. As long as a well-ordered market is accessible, cover would be commercially reasonable at the earliest time following repudiation. Since Trinidad has not shown that it could not gain access to the futures market for edible beans in early May, it has not shown that it was commercially unreasonable to cover on the date of repudiation.

Accordingly, these assignments of error are without merit.

## INSTRUCTION ON MITIGATION

In its third assignment of error, Trinidad claims the trial court erred by instructing the jury on mitigation of damages. This appears to be an issue of first impression in Nebraska because there is no Nebraska case on the application of the mitigation defense to the Code.

In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Pugh v. Great Plains Ins. Co.*, 239 Neb. 171, 474 N.W.2d 677 (1991); *Sikyta v. Arrow Stage Lines*, 238 Neb. 289, 470 N.W.2d 724 (1991).

Neb. U.C.C. § 1-103 (Reissue 1980) provides:

Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principle [sic] and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

According to § 1-103, the specific rules of the common law survive except where they are inconsistent with Code provisions. See, e.g., *Fidelity Nat. Bank v. Kneller*, 194 Ga. App. 55, 390 S.E.2d 55 (1989); *Williams v. Kloeppel*, 537 So. 2d

1033 (Fla. App. 1988). In this case, it is clear that the policies of § 2-713 are inconsistent with the defense of mitigation of damages. See comment to NJI2d Civ. 4.70.

The comment to NJI2d 4.70 states that "care must be taken in the area of the Uniform Commercial Code. Under the Uniform Commercial Code, 'mitigation of damages' is mainly a function of 'cover' ('mitigation' by the buyer) and 'resale' ('mitigation' by the seller)."

Since we have held that the language "learned of the breach" refers to the repudiation date, the buyer's damages will always be measured as of that date. To the extent it is commercially unreasonable to cover on the date of repudiation, an aggrieved buyer has a commercially reasonable time after repudiation within which to cover. The common-law doctrine of mitigation of damages would be inconsistent with the statutory scheme and with the rule we have stated.

Therefore, it was error for the court to instruct the jury on mitigation of damages. We hold, however, that the error is not grounds for reversal because Trinidad has not shown how it was prejudiced thereby.

The judgment of the district court is affirmed.

AFFIRMED.