JAMES E. CROWDER AND JENEVIEVE A. CROWDER, HUSBAND AND
WIFE, APPELLEES AND CROSS-APPELLANTS, V. AURORA
CO-OPERATIVE ELEVATOR COMPANY, A NEBRASKA CORPORATION,
APPELLANT AND CROSS-APPELLEE.

393 N.W.2d 250

Filed September 5, 1986.   No. 85-307.

Gerald D. Warren of Whitney, Newman, Mersch, Otto & Warren, for appellant.

Michael H. Powell of Powell & Powell, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

James E. Crowder sued Aurora Co-operative Elevator Company for breach of a written contract for sale of Crowder's corn, and for damages. From a judgment for $6,833 Co-op appeals and Crowder cross-appeals. We reverse and remand for a new trial.

We review the pleadings, before our examination of the facts. In his petition Crowder alleged four causes of action concerning his written contract for sale of 26,000 bushels of corn to Co-op. As alleged in his first cause of action, Crowder delivered 9,729 bushels of the contracted corn before Co-op repudiated the contract. When Co-op deducted $6,833 as the cost of its "buy-in" to cover the 16,271 bushels not delivered, Crowder brought the action to recover the $6,833 deducted from proceeds for the 9,729 bushels. Crowder's three remaining

causes of action sought a judgment for Co-op's other deductions from sale proceeds—damaged corn as nonconforming goods and incidental damages (storage costs). See Neb. U.C.C. § 2-710 (Reissue 1980). In its answer Co-op admitted the contract with Crowder but, as a defense, asserted Crowder's breach of the contract in failing to deliver 16,271 bushels of corn as contracted. Also, Co-op sought a setoff of $6,833 as the cost of the "buy-in" or "cover" regarding Co-op's purchase of 16,271 bushels of corn substituted for that not delivered by Crowder. See Neb. U.C.C. § 2-712 (Reissue 1980).

On February 24, 1983, Crowder and Co-op signed their "Future Delivery Grain Purchase Contract," requiring Crowder to deliver 26,000 bushels of No. 2 yellow corn during September 1983 at the Co-op's elevator in Murphy or Aurora. The contract specified a price of $2.72 per bushel for the corn delivered to Co-op and granted Co-op an "option to extend delivery date," without prescribing a procedure for extension of the delivery date. The contracted corn was stored in Crowder's bins on his farm near Aurora.

According to Crowder's evidence, in August 1983 Crowder "inquired" whether he could deliver contracted corn to the co-op. Crowder telephoned the co-op daily to ascertain whether corn deliveries were being accepted. As explained by Crowder: "I didn't want to load the truck up and haul it up there and haul it home." Also, in early September Crowder, on half a dozen occasions, "dropped by and saw someone" concerning corn deliveries at Co-op's Aurora elevator. On September 14 Co-op told Crowder to begin delivering corn on September 15. To deliver his corn to Co-op, Crowder used two trucks—one with an approximate capacity of 400 bushels, the other with an estimated capacity of 325 bushels. Crowder delivered 9,729 bushels of corn to the Aurora elevator between September 15 and 27. During that span, Co-op periodically "shut off" deliveries, limiting the amount of corn Crowder could deliver. On September 27, when Crowder brought a truckload of corn to the elevator, the co-op informed Crowder: "[Co-op was not] going to be able to take any more corn after that one load. . . . [They talked like] they was getting ready for the new crop coming in." Crowder made no delivery of corn after September

27 and explained: "[Co-op] refused to take my corn. . . . [T]hey wouldn't take it, couldn't receive it." After Co-op had refused any further delivery, Crowder sold the balance of the contracted corn—16,271 bushels—to another elevator at a price of $3.14 per bushel.

Co-op presented countervailing evidence. In August Crowder never inquired about corn delivery and asked about delivery on two occasions in September. The co-op's manager testified, "[Crowder] stopped by the afternoon of the 14th and he said, 'I am getting ready to haul corn,' " to which the manager responded, "Fine." The frequency of Crowder's deliveries to Co-op decreased when an auger broke and delayed loading corn at Crowder's farm. Crowder delivered "damaged" corn to Co-op, which never turned away a full truck of corn, even if the elevator was filled to capacity.

On November 10 Crowder requested payment for the 9,729 bushels delivered to Co-op in September. On November 11 Co-op informed Crowder that his delivery date had been extended to November 30 and that, on his failure to deliver, the co-op would purchase other corn to fill the contract, with "buy-in" costs charged to Crowder. The contract provided for a buy-in on 10 days' notice to Crowder. Between November 17 and 23, Crowder delivered corn to a Cargill elevator. On November 30, when Crowder did not deliver the remainder of the corn specified in the February 24 contract, Co-op purchased 16,271 bushels at $3.14 per bushel. The $0.42 per bushel difference between the contracted price and the buy-in price resulted in a "cover" cost of $6,833, which Co-op deducted from the proceeds payable to Crowder for his 9,729 bushels delivered in September. See § 2-712 ("cover"; buyer's procurement of substitute goods).

Over Crowder's objection, the court admitted into evidence three Co-op exhibits.

The first exhibit was a November 10 handwritten "interoffice memo" from Don Comer, Co-op's manager, to Co-op's general manager. The contents of the memorandum, handwritten on stationery supplied by "Stine Seed Farm, Inc.," included:

Jim Crowder in office today 10th of Nov 83.

1. Said he will not deliver balance of his contract.

2. Harvested his 83 crop and took it to another elevator.

3. He did not try to deliver any corn prior to 15th of Sept. "Tried to let him haul even when others were shut off" he was broke down from 16th till 21st then hauled from 21st to 26th then did not try to haul again.

Although Comer verified that he had written the memo "shortly after" Crowder came to the elevator on November 10, there was no evidence that the memorandum was a document regularly prepared and kept in the course of Co-op's day-to-day business involving sales of corn. Apart from Comer, no Co-op personnel testified regarding the preparation or maintenance of any memorandum similar to that written by Comer, as a part of Co-op's records. Crowder objected that Comer's November 10 memorandum did not qualify as a business record.

The second Co-op exhibit was a written summary of scale tickets for each corn delivery at the elevator during September, October, and November 1983. Co-op's three-page summary was set out in columnar form, showing the date, total bushels of corn received daily at the co-op, the time of day of each receipt, and the price for corn on the day of receipt. Comer testified the document was prepared in his office, under his supervision, and reflected "thousands" of scale tickets for corn delivered to the co-op. The co-op received 543,000 bushels of corn in September, 559,000 in October, and 19,000 during the first 10 days of November.

Co-op's third exhibit was a written summary of 61 contracts between 44 farmers and the co-op for delivery of corn during August and September 1983. The two-page summary, also in columnar form, showed the name of each farmer-seller who had contracted to deliver corn to the co-op, the total bushels under each contract, the number of bushels delivered, and the quantity of any undelivered corn under each contract. Comer testified that the summary-exhibit, prepared under his supervision, was based on original contracts and settlement sheets in Co-op's possession. A settlement sheet reflects the total of all scale tickets issued for deliveries of contracted corn.

At the conclusion of all evidence, Co-op moved for a directed verdict, contending Crowder had failed to prove any

cause of action arising out of the contract with Co-op. The court overruled Co-op's motion. While the precise procedure for the court's ultimate disposition of the case is somewhat clouded, the court, in its colloquy with counsel after overruling Co-op's motion, stated: "I believe the whole matter comes down to questions of law under the UCC and there really are no fact questions remaining for the jury to decide." After deciding that Co-op, as a matter of law, had not given notice extending the delivery time specified in its contract with Crowder, the court informed counsel:

> I want to bring the jury back in and I will explain to them what this means, and I will find that there are no questions of fact, that the plaintiff has failed to show any element of damage except that deduction and the deduction was a wrongful deduction in essence and award a judgment on that basis because there's no dispute of the facts.

To the jury the court explained:

> [A]s this case presented itself I don't believe when you look at it very carefully under the law that I had to look at it, that there were any questions of fact for you folks to decide. The sole question was whether or not the defendant gave reasonable notice of its actions after the contract had expired, and I find that it did not.

Thereupon, the court dismissed the jury, entered judgment for $6,833 on Crowder's first cause of action, and dismissed Crowder's remaining three causes of action (deduction for damaged corn and incidental damages).

Co-op claims five errors by the trial court: (1) Failing (a) to find, as a matter of law, Crowder's breach of contract in not tendering delivery of corn in the quantity specified by the contract or (b) to submit the question of breach of contract to the jury; (2) Finding a course of dealing or usage of trade was not relevant regarding the question of notice for extension of the contract; (3) Failing to allow the jury to decide whether Co-op's notice for extension of contract was reasonable; (4) Failing to allow the jury to decide the question of reasonableness of notice concerning the co-op's buy-in on Crowder's nondelivery of corn; and (5) Failing to submit to the jury Co-op's claimed setoff in consequence of the buy-in

authorized by the contract.

On cross-appeal Crowder contends: (1) Prejudicial error in admitting the November 10 memorandum and the two written summaries; and (2) Error by the district court in its directed verdict for the co-op, removing from the jury any question about Crowder's alleged damages (Co-op's deduction for damaged corn delivered by Crowder and Crowder's storage costs necessitated by Co-op's refusal to accept delivery of the contracted corn).

Co-op's first assignment of error relates to existence of a factual issue for the jury's resolution in this case, namely, whether Crowder had tendered delivery of his corn as required by Neb. U.C.C. § 2-503 (Reissue 1980). The district court held that there was but one question, or the "sole question"—the propriety of Co-op's deducting the cost of "cover," $6,833, from proceeds for Crowder's corn delivered. Implicit in the district court's ruling in favor of Crowder on that "sole question" are determinations as matters of law: Crowder had sufficiently performed the contract, and Co-op had repudiated that contract.

Only where reasonable minds can draw but one conclusion from the evidence presented is a directed verdict an appropriate method of terminating litigation. *Greening v. School Dist. of Millard, post* p. 729, 393 N.W.2d 51 (1986).

As prescribed by Neb. U.C.C. § 2-301 (Reissue 1980) regarding a contract for sale of goods: "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract."

In *Goosic Constr. Co. v. City Nat. Bank of Crete*, 196 Neb. 86, 87-88, 241 N.W.2d 521, 522 (1976), we stated: " 'Delivery' is the voluntary transfer of possession. . . . Delivery may also be defined as an act by which a seller parts with possession, and a buyer acquires possession. . . . Delivery occurs whenever a seller does everything necessary to put goods *completely and unconditionally* at buyer's disposal."

Uncontroverted evidence conclusively establishes that Crowder did not deliver 16,271 of the 26,000 bushels of corn contracted for delivery to Co-op.

Section 2-503 in pertinent part specifies the manner of a

seller's tender of delivery:

(1) Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement and this article, and in particular

(a) tender must be at a reasonable hour, and if it is goods they must be kept available for the period reasonably necessary to enable the buyer to take possession.

. . . .

(3) Where the seller is required to deliver at a particular destination tender requires he comply with subsection 1 . . . .

Comment 1 to § 2-503 states: " '[T]ender' . . . contemplates an offer coupled with a present ability to fulfill all the conditions resting on the tendering party and must be followed by actual performance if the other party shows himself ready to proceed." As expressed in 2 W. Hawkland, Uniform Commercial Code Series § 2-503:02 at 645 (1984): "From [§ 2-503's] definition it follows that the seller does not tender delivery for purposes of section 2-503 until he is in a position to actually perform. . . . [T]he mere fact that a seller has the ability to actually perform does not constitute tender of delivery until he offers to do so." As support for the foregoing statement, Hawkland refers to *Farmers Union Co-op Company of Mead v. Flamme Brothers*, 196 Neb. 699, 704, 245 N.W.2d 464, 467 (1976), where we held: "[I]n a contract calling for the delivery of goods by the seller at a specified place, tender ordinarily requires physical delivery of the goods at the destination specified in the contract."

Tender is essential in fixing certain rights and duties attendant to a contract for sale of goods. "Tender of delivery is a condition to the buyer's duty to accept the goods and, unless otherwise agreed, to his duty to pay for them. Tender entitled the seller to acceptance of the goods and to payment according to the contract." Neb. U.C.C. § 2-507(1) (Reissue 1980).

In view of *Flamme, supra*, § 2-301 must be read conjunctively with § 2-503. Actual delivery, not mere present

ability to fulfill all the conditions imposed on a tendering party, is necessary to constitute "tender" under § 2-503. Cf. *Sand Seed Service, Inc. v. Bainbridge*, 246 N.W.2d 911 (Iowa 1976) (although a seller may not be required to actually haul contracted grain to an elevator for an effective tender of delivery, mere inquiry regarding delivery does not satisfy tender of delivery required by Iowa's Uniform Commercial Code, substantially similar to § 2-503).

Crowder failed to tender delivery of 16,271 bushels of the contracted corn and, therefore, did not fully perform his contract with Co-op. Because it is undisputed that Crowder never delivered 16,271 bushels of corn required by the contract, the crucial question is: Why were the 16,271 bushels of corn not delivered to the elevator? Crowder asserts, in substance, that required tender of delivery in the face of Co-op's repudiation would be a useless act. Therefore, Crowder argues, Co-op's anticipatory breach entitles him to relief. Co-op answers that Crowder simply failed to deliver the contracted corn, which constitutes a breach barring any recovery based on the contract.

Regarding an anticipatory repudiation of a contract for sale of goods,

> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
>
> (a) for a commercially reasonable time await performance by the repudiating party; or
>
> (b) resort to any remedy for breach (Section 2-703 or Section 2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
>
> (c) in either case suspend his own performance or proceed in accordance with the provisions of this article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2-704).

Neb. U.C.C. § 2-610 (Reissue 1980).

Comment 1 to § 2-610 states: "[A]nticipatory repudiation centers upon an overt communication of intention or an action

which renders performance impossible or demonstrates a clear determination not to continue with performance." Additionally, comment 2 for § 2-610 contains: "It is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation." See, also, *Hooker and Heft v. Estate of Weinberger*, 203 Neb. 674, 680-81, 279 N.W.2d 849, 853 (1979) ("An anticipatory breach of contract is one committed before the time has come when there is a present duty of performance and is the outcome of words or acts evincing an intention to refuse performance in the future"); *Selig v. Wunderlich Contracting Co.*, 160 Neb. 215, 222, 69 N.W.2d 861, 867 (1955) (" 'Where a party bound by an executory contract repudiates his obligation before the time for performance, the promisee has . . . an option to treat the contract as ended so far as further performance is concerned . . . ' ").

Crowder's evidence tends to establish that Co-op absolutely refused to accept any corn delivery after September 27. We acknowledge that Crowder would not be required to make treks in his truck, hauling corn already rejected by Co-op, or maintain a daily vigil with his corn at Co-op's elevator. However, Co-op's evidence indicates Crowder's nondelivery is attributable to his own doing, such as an unwillingness to deliver corn with prospects of hauling 40 to 50 loads to complete delivery of the contracted corn (16,271 bushels hauled in two trucks with capacity ranging from 325 to 400 bushels), damaged corn as nonconforming goods, or sale to Co-op's competitor at a better price. The evidence, as conflicting explanations for Crowder's nondelivery, resulted in questions of fact for the jury, whether nondelivery constituted a breach which barred Crowder's recovery under the contract or whether Co-op had repudiated its agreement, an anticipatory breach, relieving Crowder from further performance of the contract but entitling him to relief regarding that contract. The defense of Crowder's breach of contract was presented in Co-op's answer and raised by the evidence. Under the circumstances breach of contract was an issue which should have been submitted to the jury. The district court's decision—that there

was but a "sole question" regarding the $6,833 to be resolved as a matter of law—is incorrect and is set aside. Consequently, we remand this matter for a new trial.

We need not discuss or answer Co-op's questions relative to reasonableness of notice (extension of contract and buy-in), course of dealings or usage of trade, and setoff. Those matters involve situations which may never arise again on retrial if the jury determines that Crowder's nonperformance (nondelivery) constitutes a breach of his contract with Co-op, thereby defeating Crowder's claim for relief based on that contract. At this juncture any disposition of Co-op's assignments of error, beyond the question regarding breach of contract as a submissible issue for the jury, would be advisory and could become moot if retrial produces a finding favorable to Co-op on its allegations of Crowder's breach of contract.

We now turn to Crowder's cross-appeal and his assignments of error directed to the exhibits—the November 10 memorandum and the two summaries—which present questions likely to recur on retrial.

Crowder claims the November 10 memorandum is hearsay and inadmissible, while Co-op suggests the memorandum was properly admitted as a business record. Consequently, admissibility of the November 10 memorandum is governed by Neb. Evid. R. 803(5) (Neb. Rev. Stat. § 27-803(5) (Reissue 1985)), as an exclusion from the hearsay rule, namely:

> A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, other than opinions or diagnoses, made at or near the time of such acts, events or conditions, in the course of a regularly conducted activity, if it was the regular course of such activity to make such memorandum, report, record, or data compilation at the time of such act, event, or condition, or within a reasonable time thereafter, as shown by the testimony of the custodian or other qualified witness unless the source of information or method or circumstances of preparation indicate lack of trustworthiness. The circumstances of the making of such memorandum report, record, or data compilation, including lack of personal knowledge by the entrant or

maker, may be shown to affect its weight.

Neb. Evid. R. 803(5), the business records hearsay exception, was construed in *Chalupa v. Hartford Fire Ins. Co.*, 217 Neb. 662, 350 N.W.2d 541 (1984), where we held that a proponent, seeking admissibility of a document under rule 803(5), must establish:

> First, the activity recorded must be a type which regularly occurs in the course of the business' day-to-day activity. Second, the record must have been made as a part of a regular business practice at or near the time of the event recorded. Third, the record must be authenticated by a custodian or other qualified witness.

*Id.* at 665, 350 N.W.2d at 543.

Routine recordkeeping, essential to the conduct of business, produces the reliability necessary for admissibility of business records. See *In re Japanese Electronic Products*, 723 F.2d 238 (3d Cir. 1983). "A substantial factor in the reliability of any system of records is the promptness with which transactions are recorded." McCormick on Evidence § 309 at 878 (E. Cleary 3d ed. 1984).

The November 10 memorandum purportedly records events which had taken place some 6 weeks before the memorandum was made. In the weeks between the occurrence of events and recordation in the memorandum, many thousand bushels of corn, even bushels in the hundreds of thousands, were received by Co-op. In the present case the span of time and elevator activity between the event and recordation of the event are circumstances which may affect weight to be given the memorandum, if such memorandum is a business record, but do not preclude admission of the memorandum into evidence under the business records exception to the hearsay rule. See Neb. Evid. R. 803(5).

However, there are foundational deficiencies which render the November 10 memorandum inadmissible. Co-op did not show that written notation of a seller's repudiated contract was ever entered, or to be entered, in Co-op's records regularly kept in the conduct of its business—purchasing corn from farmers. Neither routine records regularly maintained by Co-op nor any adopted procedure or system included recordation of a seller's

repudiation of a contract with Co-op. There was no evidence that Co-op's regular practice in its business activity required the November 10 memorandum to be contained as a part of its business records. At best, in view of the record presented, the memorandum was an unprecedented document, describing an isolated, if not unique, incident involving Co-op. The November 10 memorandum does not qualify as a business record. Failing to qualify as a business record, the memorandum in question was hearsay, see Neb. Evid. R. 801 (Neb. Rev. Stat. § 27-801 (Reissue 1985)), and, therefore, was inadmissible. Neb. Evid. R. 802 (Neb. Rev. Stat. § 27-802 (Reissue 1985)). The memorandum tended to negative Crowder's asserted position that he had partially performed the contract, when Co-op actually repudiated the corn contract. However, in view of the district court's disposition of the case—the implicit finding, as a matter of law, that Crowder had performed the contract—admitting the November 10 memorandum was not reversible error. See Neb. Evid. R. 103(1) (Neb. Rev. Stat. § 27-103(1) (Reissue 1985)) (reversible error where an improper admission of evidence affects a substantial right of a party). Nevertheless, the prospect that retrial may involve the November 10 memorandum, offered as a Co-op business record, has necessitated our discussion and disposition of Crowder's assignment of error based on Neb. Evid. R. 803(5).

Similar prospects on retrial require our considering Crowder's contentions concerning the two summaries. Before considering Crowder's questions about the two summaries, we note that each of the particular summaries to be examined was not tendered for the purpose of illustration or clarification, such as an exhibit used to aid or assist the trier of fact in understanding evidence already introduced as a mass of details. Use of an illustrative exhibit is left to the sound discretion of a trial court. See Neb. Evid. R. 611(1) (Neb. Rev. Stat. § 27-611(1) (Reissue 1985)) (judges' reasonable control over the mode of presenting evidence).

Each of the summaries which we are about to examine is real or substantial evidence, where evidentiary subject matter is presented to the trier of fact through the summary-exhibit

itself. A summary may be admissible under Neb. Evid. R. 1006 (Neb. Rev. Stat. § 27-1006 (Reissue 1985)), which provides:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The judge may order that they be produced in court.

In considering and construing the Nebraska Evidence Rules, we are guided by the policy statement in Neb. Evid. R. 102 (Neb. Rev. Stat. § 27-102 (Reissue 1985)), which provides: "These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." See *Gibson v. City of Lincoln*, 221 Neb. 304, 376 N.W.2d 785 (1985).

Recognizing that Neb. Evid. R. 1006 is Nebraska's counterpart to Fed. R. Evid. 1006 and is substantially similar to the federal rule, we find an informative statement in Weinstein: "Rule 1006 is premised on the theory that charts, summaries, or calculations are not only a convenient means of proving the contents of voluminous materials, but sometimes the only practicable method of doing so." 5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 1006[02] at 1006-5 (1983).

Further, as Wigmore explains:

Where a fact could be ascertained only by the inspection of a large number of documents made up of very *numerous detailed statements* . . . it is obvious that it would often be practically out of the question to [require] the entire mass of documents and entries to be perused by the jury or read aloud to them.

4 J. Wigmore, Evidence in Trials at Common Law § 1230 at 535 (J. Chadbourn rev. 1972).

"The purpose of Rule 1006 is to allow the use of summaries when the volume of documents being summarized is so large as to make their use impractical or impossible . . . ." *United States v. Johnson*, 594 F.2d 1253, 1255 (9th Cir. 1979). Thus, rule 1006

was designed to ameliorate a situation where a trier of fact would be confronted by reams of records or dozens upon dozens of documents to be digested for resolution of an issue. "Evidential use of . . . summaries rests within the sound discretion of the trial judge, whose action in allowing their use may not be disturbed by an appellate court except for an abuse of discretion." *United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980). See, also, *Needham v. White Laboratories, Inc.*, 639 F.2d 394 (7th Cir. 1981).

Our research of decisions in other jurisdictions discloses piecemeal consideration of the various and distinct aspects of the governing principles found in rule 1006. For example, a summary's underlying original documents or duplicates must be available for examination by the opposing party at a reasonable time and place. See *Hackett v. Housing Authority of City of San Antonio*, 750 F.2d 1308 (5th Cir. 1985). See, also, *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984); *Intern. Tech. Instruments v. Eng. Measure.*, 678 P.2d 558 (Colo. App. 1983). Irrespective of recourse, or failure, to seek discovery, for example, Neb. Ct. R. of Disc. 34 (rev. 1986) (production of documents), availability of a summary's underlying documents assures that an opposing party will have the opportunity to verify the accuracy of the summary and undertake pretrial preparation for cross-examination. See *Intern. Tech. Instruments v. Eng. Measure., supra.* See, also, 5 J. Weinstein & M. Berger, *supra* ¶ 1006[04].

The original documents or duplicates underlying a summary and the data contained in those underlying documents must be admissible. See, *State Office Systems v. Olivetti Corp. of America*, 762 F.2d 843 (10th Cir. 1985); *United States v. Johnson, supra.* See, also, *United States v. Smyth*, 556 F.2d 1179 (5th Cir. 1977); *Holt v. Community Development & Const. Corp.*, 575 S.W.2d 395 (Tex. Civ. App. 1978); *Intern. Harvester Credit v. Pioneer Tractor*, 626 P.2d 418 (Utah 1981); *Paddack v. Dave Christensen, Inc., supra.* Admissibility of underlying documents or data contained in such documents prevents introduction of inadmissible evidence such as privileged communication, inadmissible hearsay, or evidence lacking probative value (irrelevant evidence), camouflaged or

disguised as a summary.

The underlying documents or duplicates must be voluminous. See *Aquamarine Associates v. Burton Shipyard*, 659 S.W.2d 820 (Tex. 1983). See, also, *United States v. Johnson, supra*.

As a synthesis of the various decisions in other jurisdictions and for admission of an exhibit into evidence pursuant to Neb. Evid. R. 1006, we conclude and hold that the proponent of a written summary must:

1. Reasonably identify the existing and underlying documents summarized, including identification of the ultimate source of documentary information contained in the proposed summary.

2. Show that the original documents or duplicates underlying the proposed summary and the data contained in those underlying documents are otherwise admissible evidence.

3. Have served a copy of the proposed summary on the opposing party, sufficiently in advance of intended use of the summary, and have provided the opposing party with a reasonable time and place for examination of the available documents underlying such summary.

4. Establish that the documents underlying the summary are voluminous.

A factual foundation, demonstrating a fulfillment of each of the four factors set forth above, is a condition precedent to admissibility of a written summary under rule 1006. See Neb. Evid. R. 104(1) (Neb. Rev. Stat. § 27-104(1) (Reissue 1985)) (preliminary questions concerning admissibility of evidence shall be determined by the judge).

Required notice of intended use of a written summary is analogous to the notice requirement found in Neb. Evid. R. 803(22) concerning admissibility of an otherwise hearsay statement:

A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the

declarant.

See, also, *Union Elec. Co. v. Mansion House Ctr. No. Redev. Co.*, 494 S.W.2d 309 (Mo. 1973) (notice of planned use of a summary must be given to opposing party).

> We think that the framers of the rule clearly contemplated pre-trial resolution of any issues that may be raised concerning the use of summaries. By requiring that the underlying documents be made available to opposing counsel, the rule encourages counsel to eliminate objectionable matter and to stipulate to the form of the summary.

*United States v. Smyth, supra* at 1184 n.12. Although we encourage courts and counsel to resolve any questions regarding prospective use of a summary at a pretrial conference, failure to resolve such questions at a pretrial conference does not, necessarily and by itself, prohibit use of the summary if the factual foundation for admissibility under rule 1006 has been satisfied.

Although the appeal before us involves a civil case, we recognize applicability of the Nebraska Evidence Rules to criminal cases as well as civil cases. Therefore, in criminal cases courts and counsel should consider whether a defendant's constitutional right of confrontation may be violated by admission of a written summary. See *California v. Green*, 399 U.S. 149, 155-56, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970) ("we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception"). The constitutional guarantee of a defendant's right of confrontation may require production or availability of the summary's preparer to be interrogated by the defendant or defendant's counsel. See, Neb. Const. art. I, § 11; U.S. Const. amend. VI.

Further, although a proponent may fulfill the four foundational requirements we have enunciated for admission of a summary under rule 1006, an otherwise admissible and relevant summary may be excluded under Neb. Evid. R. 403 (Neb. Rev. Stat. § 27-403 (Reissue 1985)), which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Co-op failed to show that the underlying documents and data for the summaries were admissible. Under the circumstances the scale tickets were hearsay, see Neb. Evid. R. 801, not qualifying as an exception to the hearsay rule, see Neb. Evid. R. 803, and, therefore, were inadmissible, see Neb. Evid. R. 802. Co-op failed to show that Crowder had been provided with the time and place for an examination of the available documents underlying the proposed summaries. We also note that Co-op failed to serve Crowder with a copy of the proposed summaries in advance of intended use. The summary of corn contracts between Co-op and third parties suffers from an additional imperfection—irrelevance. Generally, a plaintiff's or defendant's performance or nonperformance of a contract with a third party is not relevant in factually determining whether there has been a breach of a contract between the plaintiff and defendant. See *Rickertsen v. Carskadon*, 169 Neb. 744, 100 N.W.2d 852 (1960). See, also, *Turpin v. Branaman*, 190 Va. 818, 58 S.E.2d 63 (1950) (evidential worth of proof of other and former transactions of similar character entered into by a party to a contract with strangers was remote, irrelevant, and of no probative value); *Brooks v. Steele*, 139 Ga. App. 496, 229 S.E.2d 3 (1976) (testimony of defendant's neighbor regarding construction work done by plaintiff on occasion other than those which were the subject of plaintiff's contract suit against the defendant was of extremely doubtful probative value and should have been excluded as irrelevant); *Tex. Farm Bur. Mut. Ins. Co. v. Baker*, 596 S.W.2d 639 (Tex. Civ. App. 1980) (the general rule is that prior acts or transactions by one of the parties with other persons are irrelevant). As characterized by Neb. Evid. R. 401 (Neb. Rev. Stat. § 27-401 (Reissue 1985)): "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." With all the variables and unknown quantities involved in other corn contracts involving Co-op, any evidentiary connection between those

other contracts and the Crowder-Co-op contract is reduced to a possibility, not the rational relationship based on likelihood required for relevant evidence. See *State v. Robertson*, 219 Neb. 782, 366 N.W.2d 429 (1985). Co-op does not suggest any reasonable theory that contracts with its other customers are relevant to the question of Crowder's nonperformance of his contract with Co-op. Thus, Co-op has failed to demonstrate that the underlying documents and data for the summary of contracts were admissible as relevant evidence. We conclude that the written summaries were inadmissible under rule 1006.

What we have stated regarding disposition of Co-op's assignments of error applies equally to Crowder's assignments concerning the directed verdict on the causes of action regarding deduction for damaged corn and incidental damages. Questions regarding Crowder's damages may never arise again on retrial if a jury determines that Crowder's nonperformance (nondelivery) constitutes a breach of his contract, thereby defeating Crowder's claim for damages. We decline to render an opinion which, thus, would be advisory or pertain to a moot question as the result of a jury's adverse finding regarding Crowder's claim on retrial.

The judgment of the district court is set aside, and this matter is remanded to the district court for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.