838 F.2d 994
 Michael J. FORD, d/b/a Michael J. Ford & Associates, Appellant,
v.
FIRST MUNICIPAL LEASING CORPORATION, a Corporation; and
Smith Barney, Harris, Upham & Company, Inc., a
Corporation, Appellees.
 No. 87-1422.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 16, 1987.
Decided Feb. 10, 1988.
 
 1
 Terrence D. O'Hare, Omaha, Neb., for appellant.
 
 
 2
 John E. Hubbard, Omaha, Neb., for appellees.
 
 
 3
 Before ARNOLD, and FAGG, Circuit Judges, and LARSON,* Senior District Judge.
 
 
 4
 LARSON, Senior District Judge.
 
 
 5
 Plaintiff Michael Ford appeals from the district court's[1] judgment against him. Ford brought this diversity action against defendants First Municipal Leasing Corporation and Smith Barney, Harris, Upham & Company, alleging defendants had breached an agreement to purchase or cause the purchase of bonds to be used to finance the Omaha Surgical Center.
 
 
 6
 The district court found that while First Municipal had firmly committed to purchase the bonds, it had not breached this commitment prior to receiving a letter from plaintiff and Hospital Authority No. 2 relieving it of this obligation. The court further found that Smith Barney had not committed itself in writing to purchase the bonds and was not a joint venturer with First Municipal. Ford has appealed, alleging the evidence showed that First Municipal committed either a breach or an anticipatory repudiation of the agreement to purchase the bonds and that Smith Barney was engaged in a joint venture with First Municipal. We affirm.I. BACKGROUND
 
 
 7
 As the district court noted, the facts of this case are complex. For purposes of this appeal, they may be summarized as follows: from 1975 to 1979, plaintiff Ford conceived of, designed, and built a free-standing outpatient surgical care medical facility known as the Omaha Surgical Center. Ford began discussions with defendant First Municipal to arrange for a purchase of the Center in 1978. Initially, the transaction was to involve Douglas County, but negotiations with the county broke down in May, 1979. Ford then offered to sell the Surgical Center through Hospital Authority No. 2 of Douglas County, a public corporation whose purpose was to provide adequate health care facilities at reasonable prices within its area. The proposed transaction involved the issuance of one $2,574,000 tax-exempt bond to be purchased by First Municipal, participation in which would be sold to various investors.
 
 
 8
 On May 18, 1979, First Municipal signed a letter, at counsel for the Hospital Authority's request, which stated in relevant part:
 
 
 9
 First Municipal Leasing Corporation hereby commits to purchase or cause to be purchased the above referenced Bond in the aggregate principal amount of $2,574,000, the proceeds of which are to be used to purchase a freestanding ambulatory outpatient surgical care facility known as Omaha Surgical Center (the "Hospital Facility").
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 This commitment is subject to the satisfactory completion of documentation between First Municipal Leasing Corporation and the Authority, and will hold firm for a period of sixty days from the day hereof.
 
 
 13
 The parties dispute whether a closing date was orally agreed to in meetings surrounding the preparation of this and other documents related to the proposed transaction. Ford contends that a June 1 date was agreed to, which was subsequently extended to June 6. The district court found that "the June 6 closing date may have been a goal, but ... it was not an agreed upon closing date which would give rise to a breach by FMLC."
 
 
 14
 In early June, Ford became concerned that First Municipal would not have the funds available to purchase the bond on June 6, and began exploring alternative financing through Piper, Jaffray & Hopwood. He met with local Piper representatives on June 3 and flew to Minneapolis to meet with representatives there on June 4. On June 5, counsel for the Hospital Authority, Joseph Byrne, spoke with First Municipal's representative, Bob Bauers, about the June 6 closing. Bauers explained the difficulty he was having marketing the bond. No closing with First Municipal took place on June 6.
 
 
 15
 On June 11, Ford and Byrne met with Bauers. Bauers was asked to sign a letter indicating he had been unable to come up with the funds and allowing Ford and the Hospital Authority to seek alternative financing. This letter is directed to both Ford and the Hospital Authority and states:
 
 Gentlemen:
 
 16
 We have been unable to raise sufficient funds to honor our commitment dated May 18, 1979 to purchase the [Omaha Surgical Center] bonds.
 
 
 17
 You are free to make any other arrangements for financing of this project which you feel reasonable.
 
 
 18
 There is no liability running from [plaintiff Ford or the Hospital Authority] to First Municipal Leasing Corporation or Smith, Barney, Harris, Upham Co., Inc. as a result of our previous commitment.
 
 
 19
 On June 15, Piper, Jaffray sent a letter to Hospital Authority No. 2 indicating its proposal for financing the transaction. On June 19, Byrne informed First Municipal that other financing had been arranged and directed First Municipal to refrain from any further activity with respect to the project. Piper, Jaffray was unable to market the bond, and Ford eventually sold the Surgical Center in June 1980 for $1.8 million. Four years later, Ford commenced this action, seeking to recover the difference between what he sold the building for in 1980 and the $2.1 million he expected to receive from the proposed transaction with First Municipal, as well as various additional costs incurred from June, 1979, to the time of the sale in June, 1980.
 
 
 20
 II. FIRST MUNICIPAL'S ALLEGED BREACH OF CONTRACT
 
 
 21
 Ford argues the evidence mandates a finding that First Municipal breached its agreement by failing to purchase the $2,574,000 bond on June 6, 1979. The district court specifically found to the contrary. In urging that we reject the district court's judgment, Ford argues this Court may decide the proper interpretation of the parties' agreement as a matter of law. We disagree.
 
 
 22
 The parties apparently agree that Nebraska law governs this action, and the Court finds Nebraska law applicable. See First Mid America, Inc. v. MCI Communications Corp., 212 Neb. 57, 321 N.W.2d 424, 425 (1982); 1A Moore's Federal Practice Pt. 2 paragraph 0.311 (1987). Under Nebraska law, if a contract is to be construed by reference to its terms alone and without reference to extrinsic circumstances, it is for the court alone to interpret. Able Electric Co. v. Vacanti & Randazzo Construction Co., 212 Neb. 619, 324 N.W.2d 667, 669 (1982); Meyers v. Frohm Holdings, Inc., 211 Neb. 329, 318 N.W.2d 716, 719 (1982). If, however, interpretation depends upon extrinsic facts which are in dispute, determination of the meaning of the contract is for the factfinder. Able Electric Co., 324 N.W.2d at 669; Meyers, 318 N.W.2d at 719.
 
 
 23
 The contract at issue here is silent as to the time of closing, but contains the following clause:
 
 
 24
 This commitment is subject to the satisfactory completion of documentation between First Municipal Leasing Corporation and the Authority, and will hold firm for a period of 60 days from the day hereof.
 
 
 25
 The district court heard considerable evidence on the intent of the parties and their conduct after execution of the May 18 letter containing the above clause in order to determine the parties' contractual obligations. We find such consideration to be necessary, and hold that the district court's finding as to the material terms of the contract was one of fact. Accordingly, we apply the clearly erroneous standard of review. Fed.R.Civ.P. 52(a); Sun Refining & Marketing Co. v. Goldstein Oil Co., 801 F.2d 343, 346 (8th Cir.1986); Arkansas Rice Growers Cooperative Ass'n v. Alchemy Industries, Inc., 797 F.2d 565, 567 (8th Cir.1986); Amerdyne Industries, Inc. v. POM, Inc., 760 F.2d 875, 876, 877 (8th Cir.1985).
 
 
 26
 Our review of the record and the briefs convinces us there is no clear error in the district court's finding concerning the effect of First Municipal's failure to purchase the bond on June 6. The May 18 letter was drafted by bond counsel John Gilroy. Bauers testified on behalf of First Municipal that the sixty day clause quoted above was inserted in the letter at Bauers' request because based on his experience "[t]hese deals take a minimum of 60 days to pull together, it's not something you do overnight, and I wanted to make sure, you know, that we understood that this thing was going to--wasn't going to get done, it takes a while to get done."
 
 
 27
 Gilroy's testimony confirms that the June 6 closing date was not an "absolute" term of the contract, as Ford now contends it was:
 
 
 28
 the June 1 closing date was one we had tentatively agreed to, but it was not--it was not--a failure to close on June 1st would not have been a significant breach or a significant problem, and, as I indicated, in fact, we moved the closing date and on June 6th if there had been some--you know, some indication of--of--of a reason to do it, it may have gotten moved again, but the 60 days was our outside, uh, uh, period of time within which we had to maneuver.
 
 
 29
 Counsel for the Hospital Authority, Joseph Byrne, also admitted that the closing date was typically something that was left open for subsequent negotiation after the commitment letter was signed and that there was no language in the May 18 letter itself which gave the Hospital Authority the right to set a closing on any particular day within the sixty day period. Ford never heard Bauers agree to a June 1 or June 6 closing, and Bauers testified that he agreed only to do the best he could to come up with the necessary funds by those dates.
 
 
 30
 In view of the above testimony, we find no clear error in the district court's determination that First Municipal's failure to purchase the bond on June 6 was not a breach of contract. See Anderson v. Bessemer City, 470 U.S. 564, 573-75, 105 S.Ct. 1504, 1511-13, 84 L.Ed.2d 518 (1985), cited in, Sun Refining & Marketing Co., 801 F.2d at 346; Arkansas Rice Growers, 797 F.2d at 569. Ford's contention to the contrary must be rejected.
 
 
 31
 III. FIRST MUNICIPAL'S ALLEGED ANTICIPATORY REPUDIATION
 
 
 32
 Ford argues in the alternative that the June 11 letter signed by Bauers for First Municipal constituted an anticipatory repudiation of contract. The district court's memorandum opinion does not directly address this theory of liability because it was raised for the first time in plaintiff's motion for a new trial. The district court nonetheless made the following findings regarding the effect of the June 11 letter:
 
 
 33
 Plaintiff argues that the June 11 letter (PX17) shows that FMLC could not raise the funds. However, the testimony of Bauers shows that this letter was intended to allow the Housing Authority to pursue possible financing with Piper Jaffray and other potential investors rather than to admit breach of contract or liability on the part of FMLC.... The June 11 letter does admit that FMLC had, to date, been unable to raise sufficient funds. It does not, however, speculate upon or commit to future events except to free the Hospital Authority, OSC and Ford from claims by FMLC.
 
 
 34
 Under Nebraska Law, an anticipatory repudiation requires an overt communication which demonstrates a clear determination not to continue with performance: an unqualified renunciation of the contract. Crowder v. Aurora Co-operative Elevator Co., 223 Neb. 704, 393 N.W.2d 250, 257 (1986); In re Estate of Michels, 223 Neb. 286, 389 N.W.2d 285, 289 (1986); In re Estate of C.E. Weinberger, 203 Neb. 674, 279 N.W.2d 849, 853-54 (1979).
 
 
 35
 The district court's findings regarding First Municipal's June 11 letter are well supported by the evidence and negate any intent by First Municipal to avoid its contractual obligation. This letter was drafted by Joseph Byrne, counsel for the Hospital Authority, and signed by Bauers after a meeting between Bauers, Byrne, and Ford. Byrne's memorandum to the file summarizes the purpose and results of this meeting as follows:
 
 
 36
 The next consultation then was with Mike Ford, [two other individuals] and Bob Bauers, concerning the current position of First Municipal. In a nutshell, First Municipal does not have any bonds committed. Bob Bauers appeared to be pursuing energetically possibilities and ... Bob took the position that he would not quit on the issue until we terminated him; that he would stick with it all the way. I took the position that a line had to be drawn both for his sake as well as ours. Mike was opening the facility and needed funds to complete payments and could not wait very long at all. I also took the position that Bob Bauers should find a point where he, too, would admit defeat so that he could go on to other efforts.
 
 
 37
 Bob finally very willingly signed a written statement to the Authority, the Limited Partner and Ford Associates to the effect that he was unable to fulfill his commitment, that we were free to pursue other financing and that there was no liability at this point running from the Authority, the Limited Partnership or Ford Associates to First Municipal or Smith, Barney.... We left with the understanding that in the event Bob Bauers was able to put together sufficient cash to purchase the bond before such time as we had made a commitment with another underwriter, we would be willing to discuss the situation with him.
 
 
 38
 In fact, the evidence showed that First Municipal continued its efforts to market the bond until specifically instructed not to do so, and, as late as June 23, Bauers wrote to Ford suggesting modifications in the financial arrangements which in First Municipal's view would improve the bond's marketability.
 
 
 39
 In view of the above, we reject plaintiff's argument that First Municipal repudiated its contractual obligations in any way prior to receipt of the June 19 letter from plaintiff and the Hospital Authority directing that all of First Municipal's efforts cease.[2]
 
 IV. CONCLUSION
 
 40
 For all of the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 *
 The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The Honorable C. Arlen Beam, Chief Judge, United States District Court for the District of Nebraska
 
 
 [2]
 Because of our disposition of the above issues, we need not reach the question of whether Smith Barney was engaged in a joint venture with First Municipal